Argued and submitted November 30, 2005, reversed and remanded for entry of judgment reflecting single conviction for first-degree arson and single conviction for attempted first-degree arson; sentences vacated; remanded for resentencing; otherwise affirmed February 14, appellant's petition for reconsideration filed April 11 allowed by opinion June 13, 2007

See 213 Or App 389, _____ P3d _____ (2007)

STATE OF OREGON,
*Respondent,*

*v.*

JEFFREY MICHAEL LUERS,
*Appellant.*

200106676; A115208

153 P3d 688

Shawn Wiley, Deputy Public Defender, argued the cause for appellant. With him on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Janet A. Klapstein, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

Defendant was convicted of three counts of arson in the first degree, ORS 164.325; two counts of attempted arson in the first degree, ORS 161.405, ORS 164.325; two counts of unlawful possession of a destructive device, ORS 166.382; two counts of unlawful manufacture of a destructive device, ORS 166.384; one count of criminal mischief in the first degree, ORS 164.365; and one count of attempted criminal mischief in the first degree, ORS 161.405, ORS 164.365.[1] The trial court sentenced him to a total prison sentence of 266 months followed by 36 months of post-prison supervision. On appeal, defendant assigns error to the trial court's denial of his motions to sever certain charges and to suppress certain evidence, to its denial of his motions for judgments of acquittal as to certain counts, to its failure to merge specified convictions, and to various aspects of the sentences imposed. We agree that the trial court erred in failing to merge defendant's three convictions for first-degree arson and in failing to merge his two convictions for attempted first-degree arson. We either reject or do not reach his other assignments of error. We therefore reverse and remand for merger of the relevant convictions and for resentencing, vacate his remaining sentences and remand for resentencing, and otherwise affirm.

## I. HISTORICAL AND PROCEDURAL BACKGROUND

Because defendant was convicted, we view the evidence in the light most favorable to the state, giving the state the benefit of all reasonable inferences. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Tyree Oil is a petroleum product supplier for gas stations in Lane County. On the morning of May 27, 2000, a truck driver for Tyree Oil was refueling his truck when he discovered a device that had been placed on the running board of his tractor trailer, next to the gas tank. The device consisted of a one-gallon plastic milk jug

---

[1] Statutes are quoted as relevant in the discussion. References to ORS 164.325 are to the 1999 version that was in effect at the time defendant committed his crimes. The 2005 legislature added a provision, not relevant to this case, criminalizing the act of causing a fire or explosion while engaging in the manufacture of methamphetamine. Or Laws 2005, ch 706, § 4.

that had been painted black and had a yellow sponge inserted under the handle; protruding from the sponge was an incense stick with wooden matches (which had been burned) attached to it with thread. The jug was filled with gasoline, was taped shut, and had a piece of fabric extending from the mouth of the jug to the gas tank of the truck cab, the cap of which had been removed. The driver then discovered a similar device near where he had parked the night before; the device had been crushed under the wheels of the tractor-trailer. There were at least five other tankers and an office building in the vicinity of the devices. The office building ordinarily was locked at night but was accessible to drivers 24 hours a day for the purpose of obtaining dispatch orders. Two weeks after the driver found the devices, Tyree employees discovered a hole in the chain link fence surrounding the truck yard, near where the truck had been parked.

On June 16, 2000, Eugene Police Officer Harvey and two other officers were patrolling in an unmarked police car, looking for information relating to a gathering of protesters. Harvey previously had observed people of interest in that regard near a storage unit facility—specifically, unit 14 of the facility. Shortly after midnight, Harvey saw a 1993 Ford station wagon leaving the facility; he recognized the passenger as defendant. The driver was later identified as Marshall, defendant's codefendant in his first trial.[2] Harvey followed the vehicle, which drove near the Romania car dealership lot and parked on Garden Way. Defendant and Marshall then got out and began walking. Harvey lost sight of them around 12:45 a.m. when they turned onto a footpath near the car dealership. At 12:56 a.m., Officer Willis saw the two men running toward their vehicle, watched them enter the vehicle, and began following them as they drove away.

Around the same time, a security guard at the Romania dealership saw flames coming from vehicles in the truck lot. At approximately 1:04 a.m., he called emergency personnel from the truck lot office.

---

[2] Due to the death during trial of defendant's counsel, defendant's first trial ended in a mistrial. Marshall eventually pleaded guilty to various crimes related to the events narrated here; defendant was the sole defendant in the trial underlying this appeal.

Willis continued to follow defendant and Marshall. As the vehicles reached Main Street in Springfield, Willis heard police dispatch report a fire at the Romania dealership. The vehicle in which defendant was a passenger had a malfunctioning headlight, and Eugene officers asked Springfield police to stop the vehicle on that basis. Springfield Police Officer Smith did so at 1:11 a.m. Smith proceeded to investigate the traffic infraction as well as Marshall's subsequent failure to present a driver's license. Smith then questioned defendant and Marshall regarding their whereabouts earlier in the evening and about what appeared to be marijuana in the car. A Eugene Police Officer who had arrived on the scene instructed Smith to "wait" until the fire was investigated. Eventually Eugene Police Officer Calef arrived. Approximately one-half hour after the stop was initiated, the officers learned that fire investigators believed that the Romania fire had been set intentionally. After giving *Miranda* warnings, Calef then questioned defendant, who denied having been in the area of the Romania dealership. Police arrested defendant and Marshall and searched the vehicle, where they found gloves that were later admitted into evidence at defendant's trial.

The fire took 20 minutes to contain and showed features of the presence of flammable liquids. No firefighters were injured. Three trucks were damaged, resulting in a $50,000 loss. Investigators found the charred remains of a one-gallon plastic jug and two sponges near the fire; there were petroleum distillate and gasoline residue on the jug and one of the sponge pieces. An Oregon Department of Transportation (ODOT) road maintenance building was located next to the Romania dealership. One wall of the building was approximately four feet from the burned trucks; in addition, there was a natural gas meter between the ODOT building and one of the trucks. Although no ODOT work crews happened to be in the building on the night of the fire, emergency repair crews regularly went in and out of the building 24 hours a day.

Later that same day, Harvey went to the location of the storage unit leased by defendant and another person. On the ground outside the unit Harvey observed a burned incense stick. In an affidavit supporting a request for a

search warrant, Harvey recited his observations of defendant on the night of the fire as well as his belief, based on his training and experience, that the fire was started using a time-delay incendiary device and that such devices commonly involve the use of incense sticks and other items. The trial court issued the warrant and, on searching the unit, police discovered, among other items, a bed, sleeping mats, gas cans, Coleman fuel containers, sponges, spools of thread, and incense sticks. The unit also contained several time-delay ignition devices constructed of wooden matches tied to incense sticks with thread; some of the devices had been ignited. In a loft area believed to be defendant's sleeping quarters, police discovered a bolt cutter that matched the cuts in the fence at Tyree Oil.

Defendant was indicted on three counts of arson in the first degree, two counts of attempted arson in the first degree, two counts of unlawful manufacture of a destructive device, two counts of unlawful possession of a destructive device, one count of criminal mischief in the first degree, and one count of attempted criminal mischief in the first degree.[3] He moved to sever the counts relating to the fire at the Romania dealership (three arson counts, one criminal mischief count, and one count each of unlawful manufacture and unlawful possession of a destructive device) from the counts relating to the incident at Tyree Oil (two attempted arson counts, one attempted criminal mischief count, and one count each of unlawful manufacture and possession of a destructive device). The trial court denied the motion. Defendant then attempted to waive jury trial as to only the counts relating to the fire at the Romania dealership, but the trial court did not allow him to do so. Defendant ultimately waived jury trial as to all counts.

Also before trial, defendant moved to suppress evidence discovered during the warrantless searches of his person and the vehicle in which he was a passenger on the night that he was stopped by Springfield police, as well as evidence discovered during the warrant search of the storage unit. The trial court denied the motion.

---

[3] Defendant also was indicted for two counts of conspiracy to commit arson in the first degree; those counts were later dismissed.

Defendant was tried to the court. At the close of the state's case, defendant moved for a judgment of acquittal on the factor elevating the offense of arson in the first degree to a Ballot Measure 11 offense. *See* ORS 137.700(2)(b)(A) (mandatory minimum sentence applies to arson in the first degree as defined in ORS 164.325 "when the offense represented a threat of serious physical injury"). The trial court denied that motion as well.

The trial court found defendant guilty of the counts set out above. On the convictions for unlawful manufacture and possession of a destructive device relating to the incident at Tyree Oil, the court sentenced defendant to 90 days in the county jail. On the first of the two attempted arson convictions related to that incident, the court sentenced defendant to a durational departure sentence of 44 months in prison based on the court's findings that defendant used a weapon in the commission of the offense, namely, an incendiary device, and that the device was "placed in such a fashion and in such a neighborhood that the degree of harm or loss could have been very significant" because a petroleum storage depot was located across the street. On the second attempted arson conviction, the trial court imposed a sentence of 18 months, to be served consecutively to the 44-month sentence. The court "merge[d]" the sentence for attempted criminal mischief into the 18-month attempted arson sentence.

On the convictions for unlawful manufacturing and possession of a destructive device relating to the fire at the Romania dealership, the court sentenced defendant to 24 months' and 18 months' imprisonment, respectively, with the sentences to be served concurrently with each other and consecutively to the 18-month sentence for attempted arson. The trial court "merge[d]" the sentence for criminal mischief in the first degree into the sentence for the first arson conviction; on the latter, the court sentenced defendant to 90 months' imprisonment, to be served consecutively to the 24-month sentence for unlawful manufacturing of a destructive device. The trial court also imposed 90-month prison sentences on the second and the third arson convictions, with the second to be served concurrently with the first and third to be served consecutively to the first. As noted, defendant's aggregate sentence was 266 months in prison.

## II. PRETRIAL MATTERS

### A. *Motion to Sever*

■ Because it may to obviate the need to consider other assignments of error, we begin with defendant's tenth assignment, in which he contends that the trial court erred in denying his motion to sever the counts relating to the incident at Tyree Oil, which occurred on May 27, 2000, from those relating to the fire at the Romania dealership, which occurred on June 16, 2000.[4] Defendant first contends that the denial of his motion was contrary to ORS 132.560(3)[5] and that provision's underlying constitutional guarantees of due process and a fair trial. Defendant contends that, under the statute, an important consideration in determining whether joinder of charges resulted in prejudice to a defendant is whether evidence relating to one set of charges would be admissible in a separate trial on the other charges. He contends that here, consistently with *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), evidence of the Romania fire would not have been admissible at a separate trial on the counts arising out of the Tyree Oil incident because, where the charred remains of the

---

[4] The charges apparently were joined under ORS 132.560(1)(b)(A), permitting joinder where the offenses are "[o]f the same or similar character." Defendant did not assert that joinder was improper, only that the charges should have been severed under ORS 132.560(3).

[5] ORS 132.560 provides, in part:

"(1) A charging instrument must charge but one offense, and in one form only, except that:

"(a) Where the offense may be committed by the use of different means, the charging instrument may allege the means in the alternative.

"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:

"(A) Of the same or similar character;

"(B) Based on the same act or transaction; or

"(C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

"(2) If two or more charging instruments are found in circumstances described in subsection (1)(b) of this section, the court may order them to be consolidated.

"(3) If it appears, upon motion, that the state or defendant is substantially prejudiced by a joinder of offenses under subsection (1) or (2) of this section, the court may order an election or separate trials of counts or provide whatever other relief justice requires."

ignition devices found at the Romania fire were too small to demonstrate that they were parts of devices like those found at Tyree Oil, the incidents were not sufficiently similar. Defendant also contends that the denial of his motion substantially prejudiced him because there was evidence that a large number of people used the storage unit where the incendiary materials were found and because the state's evidence of defendant's involvement in the Tyree Oil incident therefore was much weaker and more circumstantial than its "overwhelming" evidence—including defendant's presence near the fire—that defendant was involved in the Romania fire; hearing evidence pertaining to both incidents "inevitably" would influence the jury's verdict on the Tyree Oil charges, according to defendant.

Defendant also contends that trying the charges together violated his rights to jury trial and against self-incrimination. Again, according to defendant, the evidence pertaining to the Tyree Oil incident was merely circumstantial, and he wished to testify to a jury regarding his whereabouts at the time the incident occurred; he was unable to do so, however, due to his concern that he would be subject to cross-examination regarding the Romania fire, as to which counts he planned to waive jury trial.

The state responds that, under the applicable version of ORS 132.560(3), the test is not mere "prejudice[ ]," but rather "substantial[ ]" prejudice. According to the state, defendant did not meet that standard here for several reasons. First, notwithstanding defendant's assertion on appeal that he wished to testify at trial regarding his whereabouts on the night of the Tyree Oil incident, he did not file an alibi notice or make an offer of proof as to such testimony. Second, according to the state, evidence from either of the two incidents would have been admissible in a separate trial relating to the other. Third, the state contends that, in ruling on defendant's earlier motion to sever—made, that is, in the first trial, which ended in a mistrial—the trial court had stated that it would grant defendant's motion to "limit the scope of cross-examination should [defendant] choose to testify * * * and would sustain any objection to any questions that go beyond the scope of cross-examination"—but defendant failed to make any such motion.

We review for errors of law the trial court's determination that the facts presented in defendant's motion to sever did not demonstrate the existence of "substantial[ ] prejudice[ ]" to defendant, as required in ORS 132.560(3). *Cf. State v. Barone*, 329 Or 210, 217, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000) (setting out that standard of review in the context of previous version of statute, which referred to "prejudice[ ]"); *State v. Miller*, 327 Or 622, 628-29, 969 P2d 1006 (1998) ("prejudice[ ]" as used in previous version of statute is a legal standard).[6] Whether the joinder of charges substantially prejudiced a particular defendant involves a case-specific assessment of the charges and the facts alleged to support them. *See Miller*, 327 Or at 629-30 (so explaining in the context of the previous version of the statute). The mere assertion that evidence relating to some charges will influence the jury's consideration of other charges is insufficient. *See State v. Thompson*, 328 Or 248, 257, 971 P2d 879, *cert den*, 527 US 1042 (1999) (so explaining in the context of the previous version of the statute); *State v. Parker*, 119 Or App 105, 109, 849 P2d 1157, *rev den*, 317 Or 584 (1993) (noting that the possibility of prejudice exists in every situation where charges or defendants are joined in a trial). Rather, the court's analysis properly must focus on "*any* circumstance" that impairs the defendant's right to a fair trial, such as, for example, a defendant's "claim that joinder would deprive him of protections in the Oregon Evidence Code against the admission of evidence." *Miller*, 327 Or at 633 (emphasis in original). When evidence pertaining to the various charges would be mutually admissible in separate trials or is sufficiently simple and distinct to mitigate the dangers

---

[6] In *Miller*, the Supreme Court interpreted *former* ORS 132.560(3), *amended by* Oregon Laws 1999, chapter 1040, section 17, to determine what the legislature meant by the term "prejudice." The court concluded that the "prejudice" standard established in *former* ORS 132.560(3) (1997) demonstrated that the legislature intended to "authorize the court to safeguard the parties from potential injury or harm to their interests in a fair trial." *Miller*, 327 Or at 627 (emphasis omitted). The court further explained that it assesses "fairness [in this context] by evaluating the specific interests of the parties at stake in light of our legal traditions and the applicable rules of trial procedure" and that "actual or likely impairment" of a party's "interest in a trial conducted efficiently and in accordance with all applicable laws, including the constitutions, statutes, and rules of procedure and evidence, and in a decision based on a dispassionate consideration of the evidence rather than bias, emotion, or other improper criteria * * * constitutes * * * 'prejudice' within the meaning of ORS 132.560(3)." *Id*. at 627-28.

created by joinder, substantial prejudice has not been established. *State v. Meyer*, 109 Or App 598, 604, 820 P2d 861 (1991), *rev den*, 312 Or 677 (1992); *see also Miller*, 327 Or at 631 (noting that the question whether a defendant was prejudiced for the purpose of *former* ORS 132.560(3) (1997) is separate from, and not necessarily controlled by, the question of the admissibility of evidence of other crimes under OEC 404(3) and *State v. Johns*, 301 Or 535, 725 P2d 312 (1986)). Also relevant is the probable effectiveness of limiting instructions given to the jury by the court. *State v. Staley*, 142 Or App 583, 589, 923 P2d 650 (1996), *rev den*, 324 Or 560 (1997). The reviewing court must be able to determine from the record that the trial court engaged in the required prejudice analysis. *See State v. Bruning*, 180 Or App 247, 253, 42 P3d 365, *rev den*, 335 Or 114 (2002) (the defendant asserted at the hearing on her motion to sever that she intended not to testify as to certain counts, thereby affecting the admissibility of certain evidence; where the Court of Appeals was unable to determine whether the trial court engaged in a sufficient analysis of prejudice arising from joinder of the charges, the court reversed and remanded for a new trial).

We begin by reviewing the assertions in defendant's motion to sever and the trial court's ruling. In his written motion, defendant asserted in part that the Tyree Oil and Romania counts should be severed from each other because evidence of the conduct alleged in the Romania counts would not be admissible in the prosecution of the Tyree Oil counts and vice versa. Defendant also asserted that denial of his motion would impair his constitutional rights to jury trial and to remain silent. As described above, as a tactical matter, defendant wished to be tried to a jury and to testify in the Tyree Oil matter—which, according to defendant, involved only circumstantial evidence and for which he had an alibi— while waiving his right to jury trial and testifying only as to limited matters regarding the Romania fire counts.[7] In the hearing on his motion, defendant reiterated those assertions and also contended that he would be prejudiced by "publicity

---

[7] As to the Romania fire, defendant proposed to stipulate to facts establishing his guilt of criminal mischief in the first degree and to be tried to the court on factors elevating that crime to arson in the first degree and on factors elevating arson in the first degree to a Measure 11 crime.

that continues practically every single day about eco-terrorists" who, after his arrest in this case, allegedly committed crimes similar to the Romania fire. The trial court denied the motion "on the merits," "for the reason stated in the record" in the earlier case in which the trial court granted defendant's motion for a mistrial and, later, denied Marshall's motion to sever.

As previously discussed, the determination whether joinder of charges substantially prejudices a defendant must be based on a case-specific analysis of the charges and the facts alleged to support them. *See Miller*, 327 Or at 629-30 (requiring a case-specific assessment); *Bruning*, 180 Or App at 253 (an insufficient case-specific analysis of prejudice required reversal and remand for a new trial). Technically, the trial court did not make that assessment here; as noted, the ruling that the trial court applied here in response to Marshall's motion to sever was made after defendant was no longer part of that case. Nevertheless, to the extent that the arguments made in Marshall's motion, as well as their factual predicates, were the same as those made here, the trial court's assessment may properly be applied here.[8] We therefore first examine the relevant portion of the transcript in Marshall's case, which was made part of the record in this one. If the trial court properly applied its earlier ruling here, we then consider whether that ruling was correct.

As noted, after defendant was granted a mistrial in his first trial, his codefendant, Marshall, moved to sever the Tyree Oil counts from those involving the Romania fire. The record shows that, in support of his motion to sever, Marshall asserted that he planned to put his intent in issue and that doing so would "open up" cross-examination about either incident to questions about the other incident; Marshall contended that failure to sever the Tyree Oil and Romania charges therefore would put him in the "position to have the jury hear those facts about Tyree in the same case and then make the decision about his intent" to cause physical injury to persons in the Romania fire. He also expressed concern that the jury would not understand why a defendant would

_____

[8] Indeed, defendant does not contend that the trial court erred in incorporating its ruling from the earlier case.

testify as to only part of a case. He stated that "it goes back to the defendant's right to waive jury on the Romania case because he has more faith in the Court making a just decision on the facts than he would a jury, right or wrong, which is his constitutional prerogative." He summarized, "The goal is to give the defendant the benefit of his right not only to testify or not to testify but to have a jury or not have a jury. Both of those rights under the peculiar facts of this case are defeated if the matters are joined."

In denying Marshall's motion, the trial court in the earlier case stated:

"The Court feels that at the time of this trial the defendant can testify as to one incident but not the other. The Court feels that the Court can fashion an instruction to the jury that they are not to consider the fact that defendant did not comment on the Tyree [O]il case as any indication of guilt and that they cannot even discuss his failure to testify if he so chooses during their deliberations and it should play no part in this decision.[9]

"I feel * * * that the defendant can be adequately protected in his constitutional rights by filing motions in limine to limit the scope of cross-examination should he choose to testify which the Court will grant in light of the entire situation, and would sustain any objection to any questions that go beyond the precise scope of the defendant's testimony.

"With those protections I do not feel that there has been a substantial and compelling showing that these matters ought to be severed for trial and that we need to proceed both from the standpoint of everyone's rights, the victim's rights, the defendant's rights, and judicial economy and need to proceed to trial on this matter as scheduled.

"Therefore, the motion to sever will be denied."

We conclude that Marshall's arguments in the earlier case, as well as the facts underlying those arguments, were sufficiently similar to the facts and to defendant's arguments in

---

[9] We understand the trial court to have meant to refer to an instruction regarding Marshall's failure to "comment" on the charges arising out of not the Tyree Oil case but the Romania case, as to which he proposed to waive jury trial on all facts except the facts elevating first-degree arson to a Measure 11 offense.

this case to permit the trial court properly to adopt and apply its earlier ruling here.

We review, then, the trial court's assessment that defendant was not substantially prejudiced by the denial of the motion to sever in this case and conclude that the court did not err. First, notwithstanding the fact that evidence— the remains of a plastic jug, sponges, and flammable fuel— discovered at the site of the Romania fire was degraded from its original condition, that evidence was sufficiently similar to evidence discovered at the site of the Tyree Oil incident that evidence of either incident was admissible in a trial of charges arising out of the other. *See Meyer*, 109 Or App at 604. Nor were defendant's rights to jury trial and to remain silent impaired more significantly than in any case involving multiple charges, the evidence for some of which is weaker than that for others. *See Thompson*, 328 Or at 257 (a mere assertion that evidence relating to some charges will influence the jury's consideration of other charges is insufficient to show prejudice). Finally, the trial court's proposed "protections"—including, should defendant choose to testify, a limitation on cross-examination and appropriate jury instructions—were sufficient to mitigate any prejudice. *See Staley*, 142 Or App at 589. We therefore reject defendant's tenth assignment of error.

## B. *Motion to Suppress*

■ We turn to defendant's eighth and ninth assignments of error, in which he contends that the trial court erred under Article I, section 9, of the Oregon Constitution[10] and the Fourth Amendment to the United States Constitution[11]

---

[10] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[11] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

in denying his pretrial motions to suppress evidence discovered during the warrantless search of his vehicle and the warrant search of his storage unit. According to defendant, although Smith validly stopped defendant and Marshall for a traffic infraction, Smith's actions in detaining defendant and questioning him about his earlier activities in Eugene constituted an unlawful seizure because, at that time, Smith lacked objectively reasonable suspicion that defendant had committed any crime. Defendant points to evidence in the record that Eugene police who were conducting surveillance of defendant and Marshall lost sight of them for a time and never actually saw them at the Romania dealership and that, notwithstanding that lack of association with the fire that occurred there, defendant was detained after the traffic stop for approximately 30 minutes. Defendant also contends that the police exploited their unlawful seizure of his person in several ways: first, by using the time during which he was detained to determine that the Romania fire was intentionally set, thereby giving rise to probable cause to arrest him; and second, by using that time to obtain a statement from him—the false assertion that he had not been on a street near the dealership where the police had in fact observed him—which then gave rise, as he conceded at trial, to probable cause to search his vehicle and, through the use of the statement in the search warrant affidavit, to probable cause to search the storage unit.

In addition, as relevant to the federal constitutional analysis, defendant contends that, although a police officer gave him *Miranda* warnings, there was insufficient attenuation between the unlawful conduct of the police, on the one hand, and his statement and the search of the vehicle, on the other. Finally, defendant contends that the trial court's error in denying his motion was not harmless because his statement, as well as the gloves found during the search of the vehicle, were admitted at trial and because, without his statement, the search warrant affidavit did not provide probable cause to search the storage unit—a search that resulted in the discovery of numerous items of inculpatory evidence.

The state responds that the stop was valid based on the vehicle's undisputed equipment malfunction and the officers' reasonable suspicion that defendant was implicated in a

nontraffic offense, namely, the fire that had been reported to Springfield police by Eugene police. In addition, according to the state, the officers at the scene of the stop received confirmation within a reasonable time that the fire was set deliberately. The state contends that the officers therefore were authorized to conduct a further investigation of the fire, including the post-*Miranda* questioning of defendant that resulted in his denial of being in the area of the fire; that defendant's false statement about his whereabouts established probable cause to arrest him; and that the search of the car was then justified as a search incident to defendant's arrest and under the automobile exception. As to the search of the storage unit, the state contends that multiple assertions in the affidavit supported probable cause for that search, including those relating to defendant's actions on the night of the fire.

We review the trial court's order denying defendant's motion to suppress evidence for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We are bound by the trial court's findings of fact if they are supported by constitutionally sufficient evidence in the record. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). Where the trial court does not make findings on a particular issue, we presume that it decided the facts in a manner consistent with its ultimate conclusion regarding the lawfulness of the seizure and search. *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968); *State v. Nguyen*, 176 Or App 258, 262, 31 P3d 489 (2001).

We begin with the stop itself, both as made initially and as extended. As defendant concedes, the initial stop was lawful based on the vehicle's malfunctioning headlight. We further conclude that the stop was not rendered invalid by its eventual duration of 34 minutes. Specifically, we conclude that, based on information imparted by the Eugene police, Springfield police reasonably suspected that the occupants of the vehicle had been involved in criminal activity relating to the Romania fire. *See Nguyen*, 176 Or App at 263 (holding that a police officer who had received a report of a crime in progress and within two minutes observed persons leaving the scene of the reported crime had reasonable suspicion to justify stopping the persons). Accordingly, police lawfully

extended the stop in order to investigate that occurrence. *See* ORS 810.410(3)(c).

■ Next, based on defendant's false statement—made after *Miranda* warnings—regarding his whereabouts that evening and based on information from the fire investigator that the reported fire probably was intentionally set, the police developed probable cause to arrest defendant. In turn, that arrest justified the officers' search of the vehicle as a warrantless search incident to arrest. *See State v. Hoskinson*, 320 Or 83, 86, 879 P2d 180 (1994) (discovery of evidence related to crime for which the defendant is being arrested is valid justification for search incident to lawful arrest).[12]

■ Lastly, we consider the warrant search of the storage unit. As noted, defendant challenges the inclusion in the warrant affidavit of his false statement regarding his whereabouts prior to being stopped and contends that, without that information, the affidavit was insufficient to provide probable cause to search the unit. The state contends that the statement was properly obtained and that, in any event, other information in the affidavit provided probable cause, including defendant's observed presence near the scene of the fire and the burned incense stick observed by the officer outside the unit.

We agree with the state. As previously discussed, the police lawfully obtained defendant's false statement that he had not been near the scene of the fire. In any event, that statement was not necessary in order to establish probable cause to search the storage unit, because the remainder of the statements in the affidavit supplied probable cause. *See State v. Johnson*, 340 Or 319, 329, 131 P3d 173, *cert den*, ____ US ____, 127 S Ct 724 (2006) (statements of informants

---

[12] Although defendant argues that the court erred in not suppressing evidence discovered during a warrantless search of defendant's vehicle, his argument appears to be that suppression was necessary because the search was the "fruit" of an unlawful detention; defendant's brief contains no argument that the search itself was unlawful. In any event, the only evidence that derived from the search of the vehicle was a pair of gloves. Defendant does not explain how that evidence was prejudicial, and we perceive no way in which it was. Thus, even if the search was unlawful and it was error not to suppress the gloves—a conclusion we explicitly do not reach—any error was harmless.

relied on in search warrant affidavit were not necessary to establish probable cause).

Having concluded that the trial court did not err in denying defendant's motion to suppress, we need not consider whether any error was harmless. For all of the above reasons, we reject defendant's eighth and ninth assignments of error.

## III. TRIAL MATTERS

### A. *Motions for Judgments of Acquittal*

We turn to defendant's assignments of error pertaining to the conduct of his trial. In his sixth assignment of error, defendant contends that the trial court erred in denying his motion for judgments of acquittal regarding the element of the first-degree arson charges that elevated those charges to ORS 137.700 (Measure 11) offenses. Defendant first contends that ORS 164.325, defining the offense of arson in the first degree in part as "recklessly caus[ing] serious physical injury to a firefighter or peace officer acting in the line of duty relating to the fire," and ORS 137.700, providing that arson in the first degree is subject to the latter statute "when the offense represented a threat of serious physical injury," properly must be interpreted together to mean that, when the person at risk from a fire is a firefighter or peace officer responding to the fire, there must be actual injury. Alternatively, defendant contends that the evidence was insufficient to show that the Romania fire represented a threat of serious physical injury to either the security guard or the relevant firefighter. In his seventh assignment of error, defendant contends that the trial court erred in denying his motions for judgment of acquittal on the two counts of unlawful possession of a destructive device and the two counts of unlawful manufacture of a destructive device. According to defendant, the devices used in the Romania fire did not qualify as destructive devices under ORS 166.382 and ORS 166.384 because they were not "bombs" within the meaning of ORS 166.382.[13]

---

[13] ORS 166.382 describes the crime of unlawful possession of a destructive device and, as discussed more fully below, defines what constitutes a destructive device. ORS 166.384 describes the crime of unlawful manufacture of a destructive device, incorporating by reference the definition of a destructive device contained in ORS 166.382.

The state responds that defendant's sixth and seventh assignments of error fail because, viewed in the light most favorable to the state, the evidence shows both that the resulting fire "represented a threat of serious physical injury" to persons present, as required by ORS 137.700, and that the relevant devices were destructive devices within the meaning of ORS 166.382. As to the threat of serious physical injury, the state first contends that, although ORS 164.325(1)(c) requires that a fire actually cause serious physical injury to a firefighter or peace officer acting in the line of duty relating to the fire, ORS 137.700(2)(b)(A) does not differentiate between such officials and other persons and therefore requires only the circumstance stated therein—that the offense represented a threat of serious physical injury—in order to subject a first-degree arson conviction to sentencing under the latter statute. The state also contends that, in any event, the Romania fire represented a threat of serious physical injury to at least one person other than the firefighters and other emergency personnel who responded to the fire, namely, the security guard who reported it, and therefore fits within the portion of the definition of first-degree arson contained in ORS 164.325(1)(b) (defining arson in the first degree to include "recklessly plac[ing] another person in danger of physical injury"). The state points to evidence that, in reporting the fire, the security guard had to pass near it, and that he then waited in a building toward which the fire was spreading; to evidence regarding the fire's intensity and scope and the firefighters' efforts to put it out; and to the fact that the fire burned near a metered gas line.

As to whether the devices were destructive devices, the state contends that the devices met the definition in the statute because such devices need not have explosive components. Rather, under the statute, it is sufficient that they have incendiary components, as alleged and proven here by way of three witnesses' testimony describing the devices as "incendiary bombs."[14] In addition, the state notes that gasoline by its nature has explosive properties.

---

[14] The witnesses included a Eugene Police Department arson detective and an agent of what was then called the United States Bureau of Alcohol, Tobacco, and Firearms.

 We review the trial court's rulings for errors of law, viewing the evidence in the light most favorable to the state to determine whether any rational trier of fact could have found the relevant elements of the crimes beyond a reasonable doubt. *State v. Schlender*, 199 Or App 253, 255, 110 P3d 653, *rev den*, 339 Or 230 (2005). We begin with the question whether the devices used in the Romania fire were destructive devices within the meaning of ORS 166.382. ORS 166.382 provides, in part:

"(1) A person commits the crime of unlawful possession of a destructive device if the person possesses:

"(a) Any of the following devices with an explosive, incendiary or poison gas component:

"(A) Bomb;

"(B) Grenade;

"(C) Rocket having a propellant charge of more than four ounces;

"(D) Missile having an explosive or incendiary charge of more than one-quarter ounce; or

"(E) Mine; or

"(b) Any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) of this subsection and from which a destructive device may be readily assembled.

"(2) As used in this section:

"(a) 'Destructive device' does not include any device which is designed primarily or redesigned primarily for use as a signaling, pyrotechnic, line throwing, safety or similar device.

"(b) 'Possess' has the meaning given that term in ORS 161.015."

ORS 166.384(1)(a) in turn makes it unlawful to manufacture "[a] destructive device, as defined in ORS 162.382[.]"

Under ORS 166.382(1)(a), the term "destructive device" includes a "[b]omb" with either an "explosive" or "incendiary" component. The adjective "incendiary" means "of, relating to, or involving a deliberate burning of property."

*Webster's Third New Int'l Dictionary* 1141 (unabridged ed 2002). Here, the device at issue indisputably had incendiary components, particularly, the combination of gasoline and fuse materials; defendant concedes the point. He disputes, however, whether the device was a "bomb"—in particular, whether the device carried an explosive charge.

The plain meaning of the word "bomb" is

> "a projectile or other device carrying an explosive charge fused to detonate under certain conditions (as upon impact or through a timing contrivance) and that is hurled (as by a mortar), dropped (as from an aircraft), or merely set into position at a given point (as dynamite) with varying effects (as concussion, or fire-flinging, or the release of gases) depending upon the type used."

*Id.* at 249. The adjective "explosive" means "relating to, characterized or operated by, or suited to cause explosion." *Id.* at 802. In turn, "explosion" means "an act of exploding : a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy." *Id.* Finally, the verb "explode" means "to undergo rapid combustion with sudden release of energy" and "to burst violently as a result of pressure from within." *Id.* at 801. Those dictionary definitions suggest that a "bomb" necessarily includes an explosive charge, that is, something that is capable of a "sudden release of energy" that causes its container to "burst * * * from within."

■ However, by its terms, ORS 166.382(1)(a) expressly contemplates that a bomb may have *either* an explosive, an incendiary, or a poison gas component. Accordingly, the text of the statute indicates that a "bomb" as defined therein need not be capable of exploding. Rather, under ORS 166.382(1), a "bomb" may instead have, as applicable here, an incendiary rather than an explosive component. Stated another way, if, for purposes of ORS 166.382, all "bombs" must have explosive components, it would have been unnecessary for the legislature to have included that type of component among the alternatives listed in paragraph (1)(a).[15] We therefore reject

---

[15] *State ex rel Juv. Dept. v. Garrett*, 193 Or App 629, 91 P3d 830 (2004), is not to the contrary. In that case, we interpreted the term "bomb" as used in ORS 166.382 to mean a "device carrying an explosive charge," as defined in *Webster's. Id.* at 633.

defendant's argument that the device at issue here was not a bomb because it did not carry an explosive charge. Consistently with ORS 166.382, the device was a destructive device, namely, a bomb with an incendiary component.

Defendant does not contend that he did not possess or manufacture the challenged devices. Because we conclude that the devices were destructive devices for purposes of the offense statutes, a reasonable jury could find that defendant committed the crimes of possession and manufacture of a destructive device. The trial court therefore did not err in denying defendant's motions for judgments of acquittal on Counts 5, 6, 12, and 13.

We turn to whether the resulting fire represented a risk of serious physical injury to any person. As noted, defendant first contends that, as a matter of law, when the person at risk is a firefighter or peace officer, there must be actual injury. Alternatively, he contends that the evidence in this case is insufficient to show a threat of serious physical injury to any person.

We need not determine in this matter whether there must be actual injury to a firefighter or peace officer to hold defendant guilty of first-degree arson under ORS 164.325(1)(c) and ORS 137.700. Here, there is sufficient evidence in the record from which a factfinder could find beyond a reasonable doubt that there was a threat of serious physical injury to the security guard at the Romania dealership who called in emergency personnel, bringing the offense within ORS 164.325(1)(b) (defining first-degree arson to include starting a fire or causing an explosion that "recklessly places another person in danger of physical injury") and ORS 137.700(2)(b)(A) (defining first-degree arson as a Measure 11 offense "when the offense represented a threat of serious physical injury"). The evidence demonstrates that, in order to reach the telephone to call 9-1-1, the security guard had to pass near the fire; that several vehicles were on fire and that

However, we also identified that interpretation as the one that was pertinent to that particular case, which involved a youth's modification of a lawful firework into one with greater explosive capability. *See id.* We note that, in other respects, the device here was consistent with the definition in *Webster's* of a bomb: the device was "set into position" at the Romania dealership and, by design, had the effect of "fire-flinging."

the flames went as high as 10 feet; that, due in part to the fact that the fire was spreading from one vehicle to another and in part to a "small wind blowing," the fire was "spreading real fast" toward the building from which the security guard was speaking to the 9-1-1 operator; and that the fire generally was intense and volatile. The trial court therefore did not err in denying defendant's motions for judgments of acquittal on the elements of his arson convictions elevating them to ORS 137.707(2)(b)(A) offenses.

B. *Merger of Convictions*

1. *Arson and attempted arson convictions*

■ We next consider defendant's assignments of error relating to the trial court's failure to merge certain of his convictions. In his first assignment of error, he contends that the trial court erred in refusing to merge into one conviction his three convictions for arson arising out of the Romania dealership fire and in refusing to merge into one conviction his two convictions for attempted arson arising out of the Tyree Oil incident.[16] According to defendant, each incident properly should result in the conviction for only a single offense, because the various counts alleged as to each incident merely constituted alternative methods of proving his guilt of that one offense. Defendant relies on *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), under which multiple offenses merge into a single conviction if the offenses are closely joined in fact and if the anti-merger provisions of ORS 161.067 (set out below) do not apply. Defendant contends that those requirements are met here because the conduct alleged in the various counts arising out of each relevant incident was closely related to the conduct alleged in the other count or counts

---

[16] The three counts of arson in the first degree were based on ORS 164.325(1)(b), set out in the discussion below, and alleged that defendant "unlawfully and intentionally damage[d] certain property of Joe Romania Chevrolet, motor vehicles, by starting a fire or explosion," thereby (1) recklessly placing protected property, the ODOT building, in danger of damage; (2) recklessly placing protected property, the Romania office, in danger of damage; and (3) recklessly placing another (unspecified) person in danger of physical injury. The two attempted arson counts also were based on ORS 164.325(1)(b) and alleged that defendant attempted to damage property, a Tyree Oil fuel truck, by attempting to start a fire or cause an explosion, thereby (1) recklessly placing a Tyree Oil office building in danger of damage; and (2) recklessly placing another (unspecified) person in danger of physical injury.

arising from that incident and because, contrary to ORS 161.067, the alleged conduct as to each incident violated only one "statutory provision"—ORS 164.325(1)(b)—and did not require proof of an element that the other count or counts related to that incident did not require. Defendant also relies on *State v. Bell*, 181 Or App 456, 46 P3d 216, *rev den*, 334 Or 491 (2002), in which the state conceded that three counts of first-degree arson, each based on ORS 164.325(1)(b) and involving a single fire set in a motel room, should have merged; referring to *Barrett*, this court agreed.

The state responds that ORS 161.067 precludes merger as to either set of convictions. It points out that, although all of defendant's first-degree arson convictions were based on ORS 164.325(1)(b), one involved endangerment of the ODOT building, one involved endangerment of the Romania dealership office, and one involved danger to a person. Relying on *State v. Crotsley*, 308 Or 272, 278, 779 P2d 600 (1989), the state contends that the convictions therefore involved different elements and, accordingly, separate "statutory provisions" within the meaning of ORS 161.067(1), or what *Crotsley* called "separate and distinct legislative concerns"—as relevant to arson, the protection of property, on the one hand, and the protection of human life, on the other. Alternatively, relying on this court's decision in *State v. Glaspey*, 184 Or App 170, 55 P3d 562 (2002), *rev'd*, 337 Or 558, 100 P3d 730 (2004), the state contends that there were at least two victims of the arson committed at the Romania dealership—the security guard and a firefighter who testified at trial, Van Moos; and that the attempted arson convictions also involved multiple victims, namely, various neighborhood residents. As to its concession in *Bell*, the state now contends that that concession was incorrect in light of *State v. Barnum*, 333 Or 297, 39 P3d 178 (2002).

The so-called anti-merger statute, ORS 161.067, provides, in part:

"(1) When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations.

"(2) When the same conduct or criminal episode, though violating only one statutory provision involves two or more victims, there are as many separately punishable offenses as there are victims. However, two or more persons owning joint interests in real or personal property shall be considered a single victim for purposes of determining the number of separately punishable offenses if the property is the subject of [arson and related offenses as defined in ORS 164.315, ORS 164.325, or ORS 164.335, among other crimes.]

"(3) When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

We first consider whether merger was precluded under ORS 161.067(1). We begin by reviewing the current state of the law in relation to that provision. In *Crotsley*, the court applied ORS 161.067(1),[17] to the defendant's convictions for first- and third-degree rape involving a 14-year-old victim. 308 Or at 275. The court concluded that, in committing those crimes, the defendant had engaged in a single criminal episode; that his acts violated two or more "statutory provisions," that is, provisions addressing "separate and distinct legislative concerns," and that each provision at issue in that case required proof of an element that the others did not. *Id.* at 278. Specifically, the court determined that ORS 163.375, setting out the crime of first-degree rape, provided "three alternative combinations of elements" that constituted that crime—the use of forcible compulsion, ORS 163.375(1)(a); a victim under 12 years of age, ORS 163.375(1)(b); and a victim who is a close family member of the perpetrator and is under 16 years of age, ORS 163.371(1)(c). 308 Or at 278-79. Accordingly, where the

---

[17] *Crotsley* and other cases cited herein were decided under *former* ORS 161.062, *repealed by* Oregon Laws 1999, chapter 136, section 1, the predecessor to ORS 161.067. For our purposes, the statutes are identical, and we refer only to ORS 161.067.

defendant was charged with first-degree rape based on his forcible compulsion of the victim and his conviction for third-degree rape was based on the victim's age, those convictions addressed separate legislative concerns and required proof of different elements; accordingly, the convictions did not merge. *Id*. at 279-80. The court reached the same result with regard to the defendant's convictions for first- and third-degree sodomy. *Id*. at 280.

Next, in *Barrett*, the Supreme Court considered whether ORS 161.067(1) precluded merger of the defendant's three convictions for aggravated murder of one victim based on three aggravating circumstances: that the murder was committed during commission of a robbery; that it was committed during commission of a kidnapping; and that it was committed in order to conceal the perpetrator's identity. 331 Or at 29. The court concluded that the three convictions did *not* violate two or more statutory provisions, or require proof of different elements, for purposes of ORS 161.067(1). 331 Or at 31. The court noted that, although the phrase "statutory provision" does not necessarily mean a section, subsection, or paragraph, the use of a single section "is some indication that the legislature intended to define a single crime." *Id*. at 35. The court further noted that the statute defining aggravated murder uses the phrase "committed under, or accompanied by, *any*" of the various aggravating circumstances; the court inferred that the enumerated circumstances "simply serve to prove the single essential element of 'aggravation.'" *Id*. (emphasis in *Barrett*). The court also concluded that the single harm that the legislature intended to address in the aggravated murder statute was "the intentional, aggravated killing of another human being." *Id*. at 36. The court rejected this court's conclusion that each aggravating circumstance involved a different harm to the victim, concluding instead that the aggravating factors "constitute no more than different theories under which murder becomes subject to the enhanced penalties for aggravated murder." *Id*. It accordingly remanded the case to the circuit court for entry of one judgment of conviction for aggravated murder that separately enumerated each aggravating factor. *Id*. at 37.

Next, in *Barnum*, the court applied ORS 161.067(1) to the defendant's two convictions for burglary. The relevant two counts of the indictment in that case charged that the

defendant had entered and remained in the victim's home with the intent to commit arson and that he had entered and remained in the victim's home with the intent to commit theft. 333 Or at 300. The court noted that, under ORS 164.225, a person commits burglary when he "enters or remains unlawfully" in a dwelling with the intent to commit a crime therein and that the defendant had not challenged the form or degree of specificity of the indictment in his case. 333 Or at 302. The court concluded that, if the jury found that each element in each count had been proved beyond a reasonable doubt, the defendant could properly be convicted of both counts, regardless of whether those two violations were separately punishable. *Id.* The court concluded, however, that under ORS 161.067(3), providing for separate punishment when crimes constitute repeated violations of the same statutory provision when the crimes are separated by a sufficient pause in the defendant's criminal conduct, the defendant could not be separately punished for each conviction because there was not a sufficient pause between the defendant's commission of the theft intended in the first burglary count and his commission of the arson intended in the second burglary count. *Id.* at 303.

As noted, in *Bell*, a per curiam opinion, this court accepted the state's concession—now disavowed—that *Barrett* required merger under ORS 161.067(1) of the defendant's three convictions for arson involving a single fire and based on the same statutory provision.[18] However, in doing so, we did not specifically analyze the arson statute according to the principles established in *Barrett*. Moreover, although *Barnum* had been decided three months earlier, we did not mention the latter case or note any tension between it and *Barrett*. Accordingly, although *Bell* concerned the same offense statute as the one at issue here, we do not regard it as controlling precedent in this case.

We turn to another case decided only recently, *State v. White*, 341 Or 624, 147 P3d 313 (2006), which, like

---

[18] The defendant in *Bell* was charged with intentionally setting a fire and thereby (1) damaging a dwelling (a motel); (2) damaging a dwelling (the motel) and its contents, thereby recklessly placing the dwelling in danger; and (3) damaging a dwelling (the motel) and its contents, thereby recklessly placing the employees and occupants of the dwelling in danger. 181 Or App at 457.

*Barnum*, involves the burglary statute, ORS 164.225. In *White*, the defendant was convicted of two counts of burglary, based on the defendant's entry into a building with the intent to commit the crime of assault and his entry with the intent to commit the crime of menacing. 341 Or at 627. The Supreme Court resolved the tension between its opinions in *Barrett* and *Barnum* and clarified that *Barrett* provides the proper analysis for determining whether a defendant's convictions should merge and that *Barnum* should not be followed. *Id*. at 637-38. In *White*, the Supreme Court explained that, as to ORS 161.067(1), the "mistake[ ]" in *Barnum* "arose out of an assumption that the burglary statute contains two separate 'statutory provisions.'" 341 Or at 638. It explained, "By assuming, rather than searching for, the legislative intent behind the burglary statutes, this court in *Barnum* short-circuited the process that it discussed and employed in its earlier cases to determine whether the defendant had violated 'two or more statutory provisions * * *.'" *Id*. at 635. It noted, consistently with *Barrett* and *Crotsley*, that in order to determine whether the defendant's conduct violated "two or more statutory provisions," the proper analysis is to first determine whether the prohibitions violated by the defendant involve "separate and distinct legislative concerns." *Id*. at 638.

The court then explained that the language of the burglary statute reveals a legislative intent to treat a single unlawful entry as a violation of only one statutory provision, even where the defendant enters with the intent to commit more than one crime. *Id*. at 640. "The burglary statute refers to an 'intent to commit *a* crime' * * *—any crime." *Id*. (emphasis added in *White*). "Under the clear words of the statute, the state must prove some criminal intent, but the nature of the intended crime is irrelevant." *Id*. (emphasis omitted). The court concluded that there is no basis to differentiate a burglary based on an intent to assault and a burglary based on an intent to menace. *Id*. The convictions therefore merged. *Id*. at 640-41.

We return to the question of whether defendant's multiple first-degree arson convictions and his multiple attempted first-degree arson convictions were subject, respectively, to merger under ORS 161.067(1). We begin by

examining the relevant offense statute. *See Barrett*, 331 Or at 34-36 (examining the offense statute in order to determine whether it addressed separate legislative concerns and therefore constituted separate statutory provisions for merger purposes). ORS 164.325 provided:

"(1) A person commits the crime of arson in the first degree if, by starting a fire or causing an explosion, the person intentionally damages:

"(a) Protected property of another;

"(b) Any property, whether the property of the person or the property of another person, and such act recklessly places another person in danger of physical injury or protected property of another in danger of damage; or

"(c) Any property, whether the property of the person or the property of another person, and recklessly causes serious physical injury to a firefighter or peace officer acting in the line of duty relating to the fire.

"(2) Arson in the first degree is a Class A felony."

*See also* ORS 164.305 (defining protected property as "any structure, place or thing customarily occupied by people, including 'public buildings' as defined by ORS 479.168 and 'forestland,' as defined by ORS 477.001").

As we have noted, each of defendant's arson offenses, as pleaded and proved, as well as each of his attempted arson offenses, violated only one statutory provision, namely ORS 164.325(1)(b). That aspect of our analysis weighs in favor of merger under ORS 161.067(1). *Cf. Barrett*, 331 Or at 35 (use of a single section is some indication that legislature intended to define a single crime).[19] Further, the circumstance at issue in each offense does not require proof of an "element" that the other circumstances do not.

---

[19] In *State v. Beason*, 170 Or App 414, 429-30, 12 P3d 560 (2000), *rev den*, 331 Or 692 (2001), we concluded that where the prefatory language of subsection (1) of the murder statute, ORS 163.115, referred to acts that "constitute[ ] murder," that fact suggested that each of the following paragraphs merely described separate ways of committing that single offense. Here, defendant was convicted of three counts of arson based on ORS 164.325(1)(b). Thus, we need not, and do not, decide whether ORS 161.067(1) would require merger of convictions based on different paragraphs of subsection (1) of the first-degree arson statute.

We turn to whether ORS 164.325(1)(b) reflects a single legislative concern, on the one hand, or "separate and distinct" legislative concerns, on the other. By its terms, ORS 164.325(1)(b) involves intentional damage to property, with either of two consequences: recklessly placing another person in danger of physical injury or recklessly placing protected property of another in danger of damage. On their face, those two separately stated consequences might appear to implicate separate and distinct legislative concerns. Given the definition in ORS 164.305 of "protected property," however—property "customarily occupied by people"—we understand those two consequences to reflect a single concern, namely, to protect human life and safety. *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 144 (July 1970) ("The aim of the Commission is to protect human life and safety by enhancing the degree of arson to first degree when the property involved is a building, structure or thing of a kind which is typically occupied by people."); *see also id.* at § 141 (definition in ORS 164.305 of "[p]rotected property" has the purpose of protecting structures or things typically occupied by people and is consistent with the "primary rationale" of the arson offense, which is the protection of human life or safety; the definition includes "forestland" because forest fires also present a high risk to human safety).

Certainly, those alternative consequences are not separate legislative concerns in the manner of the convictions in *Crotsley*—concerns about rape involving, respectively, forcible compulsion, a victim under 12 years of age, or a victim who is a close family member under 16 years of age. Rather, the distinctions embodied in ORS 164.325(1)(b), to the extent that there are any, are more akin to those in *Barrett*: various circumstances involving a danger to the life and safety of persons, each of which serves the purpose of aggravating the crime to first-degree arson. *See* 331 Or at 36 (the harm that the legislature intended to address in ORS 163.095 was "the intentional, aggravated killing of another human being"). Put differently, the stated circumstances "constitute no more than different theories under which [second-degree arson] becomes subject to the enhanced penalties" for first-degree arson. *See* 331 Or at 36 (applying that standard to multiple convictions for aggravated murder).

For all of the above reasons, we conclude that ORS 161.067(1) does not preclude merger of defendant's three convictions for first-degree arson arising out of his conduct in setting the Romania fire. By the same reasoning, that statute also does not preclude merger of defendant's two convictions for attempted arson arising out of the Tyree Oil incident.

We next consider whether merger is precluded by reason of different "victims" of defendant's arson and attempted crimes, as provided in ORS 161.067(2). The state points to the trial court's finding that defendant's act of setting the Romania fire "represented a [threat of] serious physical injury to the security guard, the fire fighters, and others who might have been in this vicinity" and to its finding that the Tyree Oil incident placed nearby residents in danger. The trial court made those findings, however, in the context of finding the existence of aggravating factors elevating defendant's arson crimes to Measure 11 offenses[20] and in the context of finding defendant guilty of attempted first-degree arson. Indeed, as discussed below, the persons mentioned by the trial court were not the subjects of distinctions made in the indictment in this case. Rather, whether defendant's three convictions for arson involved separate "victims" for the purpose of ORS 161.067(2) requires a different analysis.

*State v. Glaspey*, 337 Or 558, 100 P3d 730 (2004), sets out the template for that analysis. In that case, the defendant assaulted his wife; the couple's two children witnessed the assault. *Id.* at 560. The defendant was convicted of two counts of felony assault in the fourth degree, as provided in ORS 163.160, based on the theory that each of the two child witnesses was a victim of the crime and that the defendant therefore had committed two offenses. 337 Or at 560. On appeal, the defendant contended that the child witnesses were not victims of the crimes for the purposes of either the offense statute or ORS 161.067(2). 337 Or at 561. This court disagreed and affirmed the separate convictions. *Id.*

The Supreme Court reversed. The court explained that whether persons are "victims" for the purpose of ORS

---

[20] The trial court made the quoted finding in the context of the first arson count; it made similar, albeit more generally stated, findings in relation to the second and third arson counts.

161.067(2) depends on the legislature's intent with regard to the specific substantive statute defining the relevant offense. 337 Or at 563; *see also id.* at 567 (ORS 161.067(2) "invests the term 'victim' with the same meaning that it has for the relevant substantive statutory provision that defines the offense"). The court determined that intent by construing the offense statute according to the analytical method set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The court concluded that, for purposes of the offense of felony assault in the fourth degree, the term "victim" refers to a person who is "directly and physically injured" by an assault and does not refer to a minor child who witnesses the assault as described in that offense statute. *Glaspey*, 337 Or at 565. The court concluded that the trial court therefore had erred in failing to merge the defendant's two convictions. *Id.* at 564-67.

Here, defendant was charged with three counts of first-degree arson as provided in ORS 164.325(1)(b). We again consider the text of that provision, in this instance for the purpose of determining who, if anyone, is the "victim" of the offense. Again, the statute provides that a person commits the crime of first-degree arson if, by starting a fire or causing an explosion, the person "intentionally damages"

"(b) Any property, whether the property of the person or the property of another person, and such act recklessly places another person in danger of physical injury or protected property of another in danger of damage[.]"

Unlike the offense statute at issue in *Glaspey*, ORS 164.325(1)(b) does not use the term "victim." Rather, by its terms, the conduct that is criminalized primarily is conduct directed at property. *See also* ORS 164.325(1)(a) (providing that a person commits the crime by damaging "[p]rotected property of another"); ORS 164.325(1)(c) (providing that a person commits the crime by damaging "[a]ny property" and recklessly causing serious physical injury to an emergency responder). Nevertheless, ordinarily, a victim is a person. *See Webster's* at 2550. Where the text of ORS 164.325(1)(b) indicates that the target of the criminal conduct is property and where a victim for the purpose of ORS 161.067(2) ordinarily is a person, it is reasonable to conclude that, for the purpose

of ORS 161.067(2), the victim of the crime of first-degree arson as provided in ORS 164.325(1)(b) is the owner of the property.

It is true that commission of the crime of first-degree arson under ORS 164.325(1)(b) also requires that the conduct of intentionally damaging property recklessly place another person in danger of physical injury or place protected property—again, property customarily occupied by people, ORS 164.305(1)—in danger of damage. Indeed, that requirement informs our conclusion, reached above, that all of the circumstances enumerated in ORS 164.325(1)(b) reflect a single legislative concern for the purposes of merger under ORS 161.067(1). That understanding, however, does not control our analysis of who is a "victim" for purposes of ORS 161.067(2). Rather, we conclude that the element of recklessly placing persons or protected property in danger is a collateral or secondary consequence (albeit necessary to the statutory definition of first-degree arson) of the act of intentionally damaging property. It therefore is comparable to the requirement, in the felony fourth-degree assault statute at issue in *Glaspey*, that a child witness the assault. Accordingly, it is consistent with the court's reasoning in *Glaspey*, as well as with the text of ORS 164.325(1)(b), to conclude that the entity that is, in effect, "directly and physically injured" by the crime of arson is the owner of the intentionally damaged property.

The statutory context of ORS 164.325(1)(b) supports that interpretation. As quoted above, ORS 161.067(2) itself provides in part that, for the purposes of specified crimes including first-degree arson, "two or more persons owning joint interests in real or personal property shall be considered a single victim for purposes of determining the number of separately punishable offenses[.]"[21] That provision also suggests that, in the case of property crimes such as arson, the "victim"—in *Glaspey* terms, the entity "directly and physically injured" or harmed—is the owner of the damaged property.

---

[21] The other specified crimes include theft; unauthorized use of a vehicle; criminal possession of rented or leased personal property; burglary; criminal trespass; and forgery and related offenses.

Here, as noted, defendant was charged with and convicted of three counts of arson in the first degree. However, as noted above, each count charged, in identical language, that defendant "intentionally damage[d] certain property of Joe Romania Chevrolet, motor vehicles[.]" As we have construed ORS 164.325(1)(b), the owner of that property was the "victim" of defendant's arson crime for the purpose of ORS 161.067(2). Conversely, although each count recited a different secondary consequence—in the first count, that defendant thereby recklessly placed protected property, the ODOT building, in danger of damage; in the second, that he thereby recklessly placed protected property, the Romania office building, in danger of damage; and in the third, that he thereby recklessly placed "another person" in danger of physical injury—the entities that were subject to those secondary consequences, whether property or persons, were not victims for the purpose of the arson statute and therefore were not victims for the purpose of ORS 161.067(2). Finally, even assuming, which the state does not argue, that the motor vehicles were jointly owned by two or more persons, under ORS 161.067(2), those persons properly must be considered a single victim. For all of those reasons, ORS 161.067(2) does not preclude merger of defendant's three convictions for arson.

A similar analysis prevails with regard to defendant's two convictions for attempted arson. Again, each count alleged that, by attempting to start a fire or cause an explosion, defendant intentionally attempted to "damage property of Tyree Oil, Inc., a fuel truck." Although the counts alleged distinct secondary consequences—for the first count, placing protected property, the Tyree Oil office building, in danger of damage; and for the second, placing another person in danger of physical injury—the victim for each count was, as we have construed ORS 164.325(1)(b), the owner of the fuel truck that was the direct object of defendant's conduct—Tyree Oil.

Because merger was not precluded by ORS 161.067(1) or ORS 161.067(2), the trial court erred in failing to merge defendant's three arson convictions into a single conviction and in failing to merge his two attempted arson convictions into a single conviction. We therefore vacate all of those convictions and remand for merger, with instructions

to articulate in the judgment the theory applicable to each merged count.

### 2. *Unlawful manufacture and possession of a destructive device*

We turn to defendant's third assignment of error, in which he contends that the trial court erred in failing to merge his two convictions for unlawful possession of a destructive device with his two convictions for unlawful manufacture of a destructive device.[22] Defendant argues that, because one cannot manufacture a destructive device without also possessing it, the statute criminalizing the possession of such a device does not require proof of any element for which proof is not also required under the statute criminalizing the manufacture of the device; accordingly, merger is not precluded under ORS 161.067(1).

The state responds that, although one count of each crime was based on the Tyree Oil incident and the other count of each crime was based on the Romania fire, in fact, the evidence showed, and the trial court implicitly found, that defendant "manufactured" the devices in his storage unit and had the opportunity to renounce his criminal intent before taking and placing the devices at the respective crime scenes, during which conduct he "possessed" them. The state reasons that merger therefore is precluded by ORS 161.067(3), prohibiting merger when conduct violates only one statutory provision and involves only one victim but the violations are "separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

The state also contends that merger was precluded under ORS 161.067(1). First, the state argues that, by the plain meaning of the terms, "manufacture" contemplates the assembly of raw materials whereas "possession" contemplates physical possession of a completed device; according to the state, each provision therefore requires proof of an element that the other does not. In making that argument, the state relies on *State v. Brown/Ford,* 106 Or App 291, 807 P2d

---

[22] One count of manufacture and one count of possession were based on the Tyree Oil incident; the other counts—one of each—were based on the Romania fire.

316 (1990), *rev den*, 311 Or 427 (1991), in which we considered whether ORS 161.067(1) precludes merger of the crimes of possession of a controlled substance and manufacture of a controlled substance and concluded that, where the legislature had defined "manufacture" in the relevant version of ORS 475.005 as "the production, preparation, propagation, compounding, conversion or processing of a controlled substance" and where possession does not necessarily require proof of any of those activities, each crime required proof of an element that the other did not. Also as relevant to preclusion of merger under ORS 161.067(1), the state contends that, in enacting the separate crimes of manufacture and possession of a destructive device, the legislature could have concluded that those two courses of conduct presented different risks to the public and therefore represented different legislative concerns.

We begin with whether merger was precluded under ORS 161.067(1). In contrast to our analysis of defendant's arson convictions, here, it is clear that defendant's acts constituting each pair of convictions violated two statutory provisions. The question then becomes whether each conviction within those pairs of convictions required proof of an element that the other did not. *Crotsley*, 308 Or at 278. In making that determination, we examine only the statutory elements of each offense, not the underlying factual circumstances recited in the indictment. *See State v. Wright*, 150 Or App 159, 162, 945 P2d 1083 (1997), *rev den*, 326 Or 390 (1998).

It is true that, in *Brown/Ford*, we concluded that the crimes of possession and manufacture of a controlled substance each required proof of an element that the other did not. *Brown/Ford*, 106 Or App at 297. However, in that case, although we expressly determined that "possession does not necessarily require proof of any" of the activities defined as constituting manufacture, we did not explain why manufacture of a controlled substance did not require proof of its possession. *Id*. at 296-97. In addition, here, in contrast to the statutory scheme relating to controlled substances, we lack a statutory definition of the term "manufacture."

Nevertheless, we agree with the state that each offense requires proof of an element that the other does not.

First, under ORS 166.384, a person manufactures a destructive device when the person "assembles, produces, or otherwise manufactures" such a device. Thus, a person commits that offense when a person assembles the components of the device; the state need not prove that, after assembling the device, the person had possession of it in its completed form. Conversely, possession of something commonly is understood to relate to physical control of the object, not to its production or assembly. *See Webster's* at 1770 (defining the verb "possess" as "to have and hold as property" and "to take into one's possession," and defining the noun "possession" as "actual physical control * * * of property" and as the "act or condition of having in or taking into one's control"). Thus, the crime of possession of a destructive device does not require proof that the person assembled the device into its completed form. Accordingly, ORS 161.067(1) precludes merger of defendant's two convictions for possession of a destructive device into his two convictions for manufacture of a destructive device.[23] The trial court did not err in declining to merge the convictions.

## IV. SENTENCING ISSUES

### A. *Applicability of Departure Factors*

We turn to defendant's challenges to his sentences. In his second assignment of error, defendant contends that the trial court erred in imposing a 44-month durational departure sentence on one of his convictions for attempted first-degree arson based on the Tyree Oil incident. Specifically, defendant argues that the trial court erred in finding that the incendiary device used by defendant in the commission of the offense was a "weapon" and in finding that defendant's placement of the device near a petroleum storage depot could have resulted, although it did not actually result, in "very significant" harm or loss. *See* OAR 213-008-0002(1)(b)(E); OAR 213-008-0002(1)(b)(J).

---

[23] We need not consider whether, as the state argues, ORS 161.067(3) precludes merger of those convictions by reason of "a sufficient pause in * * * defendant's criminal conduct to afford * * * defendant an opportunity to renounce the criminal intent." That is because subsection (3) applies when the same conduct or criminal episode violates only one statutory provision. Here, as discussed, defendant seeks merger of two different statutory provisions.

As discussed above, defendant's three convictions for first-degree arson and his two convictions for attempted first-degree arson must be vacated and remanded for merger and for resentencing.[24] On resentencing, defendant will be entitled to the procedures set out in Oregon Laws 2005, chapter 463, sections 1 to 7 and 21 to 23, *compiled as a note before* ORS 136.001 (2005). Although it is possible that the issues presented in defendant's second assignment of error will arise in that proceeding, nevertheless, given the differences in procedure, as well as other possible differences, between defendant's original sentencing and his resentencing, we cannot say that it is likely that they will do so. We therefore decline to determine at this time whether the trial court erred in applying the challenged departure factors to defendant.

In his fourth assignment of error, defendant contends that the trial court erred in imposing an 18-month durational departure sentence on one of his convictions for unlawful possession of a destructive device based on its findings that defendant "not only manufactured this device but you took it and delivered it * * * and by your own admission set the fire that could have had disastrous results and you created a risk of substantial harm to a number of victims in this instance."[25] Again, that issue is not certain to arise on remand. Moreover, we agree with the state that, in light of defendant's concurrent 24-month sentence, any error was, in effect, harmless. *See State v. Tremillion*, 111 Or App 375,

_____

[24] Moreover, based on the trial court's error in failing to merge the relevant convictions, we necessarily remand the entire case for resentencing. ORS 138.222(5); *see also State v. Rodvelt*, 187 Or App 128, 136, 66 P3d 577, *rev den*, 336 Or 17 (2003) (failure to merge convictions is an error requiring resentencing for purposes of ORS 138.222(5)).

[25] Defendant understands that the trial court thereby made two findings: that the degree of harm or loss attributed to the crime was significantly greater than typical for such an offense, as provided in OAR 213-008-0002(1)(b)(J), and that defendant not only possessed the device but also ignited it. Defendant argues that the former impermissibly relies on potential harm. As to the latter, defendant argues that it also impermissibly focuses on the risk of harm; in addition, to the extent that the trial court believed that igniting the device aggravated the crime beyond mere possession, that circumstance was captured in defendant's conviction for arson in the first degree. Alternatively, defendant argues that his ignition of the device was used as evidence of his possession of it and therefore was "captured as an element" of the offense; accordingly, it was improper also to use it as a departure factor.

376, 826 P2d 95, *rev den*, 313 Or 300 (1992) (the existence of a concurrent sentence rendered harmless any error relating to the challenged sentence). We therefore reject defendant's fourth assignment of error.

B. *Constitutional Challenges to Total Sentence Length*

In his fifth assignment of error, relying on Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the Constitution of the United States, defendant contends that his cumulative sentence of 266 months constitutes cruel and unusual punishment and is unconstitutionally disproportionate to the sentence received by his codefendant and to the circumstances surrounding his commission of the crimes. However, we are reversing several of defendant's convictions and remanding for merger; the total sentence length for defendant's convictions therefore necessarily will be substantially shorter. In addition, as noted, the remainder of defendant's sentences also must be vacated and remanded for resentencing under ORS 138.222(5). We therefore do not consider defendant's challenges to his total sentence length of 266 months.

C. *Blakely Challenges*

Finally, in a supplemental brief, defendant raises various challenges to his sentences based on the United States Supreme Court's application of the Sixth Amendment right to jury trial in *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), and *Apprendi v. New Jersey*, 540 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000). As noted above, on remand for merger and for resentencing, defendant must be afforded the procedures set out in Oregon Laws 2005, chapter 463, *compiled as a note before* ORS 136.001 (2005), including an election as to whether to have a jury try any proposed departure factors (referred to in those provisions as "enhancement fact[s]"). Defendant's *Apprendi-* and *Blakely*-based challenges therefore are moot.

Reversed and remanded for entry of judgment reflecting single conviction for first-degree arson and single conviction for attempted first-degree arson; sentences vacated; remanded for resentencing; otherwise affirmed.