Submitted on record and briefs August 31, affirmed October 31, 2007

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**DONNIE JAMES CRAWFORD,**
aka Donnie James Crawford Jr.,
*Defendant-Appellant.*

Multnomah County Circuit Court
041136051; A129481

171 P3d 974

Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, Legal Services Division, and Joshua B. Crowther, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Ortega, Judge, and Deits, Judge pro tempore.

BREWER, C. J.

## BREWER, C. J.

A number of people were "hanging out" in front of a house in Portland, some in a car and others in the yard. A car drove past the house and, about ten minutes later, returned to the house. Defendant was in the back seat of the car, and he told one of the people in the yard, Taylor, to "come here." Defendant and Taylor then exchanged words, and defendant began firing a gun in Taylor's direction, narrowly missing another person who was standing near Taylor. Investigating officers found bullet holes in the front yard fence and a bullet impact on a car parked in the driveway, as well as bullet fragments on the ground.

Among other charges, defendant was indicted on two counts of unlawful use of a weapon, one count under ORS 166.220(1)(a), and the other count under ORS 166.220(1)(b).[1] He waived a jury trial and was tried to the court, which convicted him of both counts of unlawful use of a weapon and another count of felon in possession of a weapon.[2] The trial court entered separate convictions on all three counts, despite defendant's objection that the two unlawful use of a weapon convictions must be merged. On appeal, defendant argues that the trial court erred in not merging those convictions. We affirm.

ORS 161.067(1) provides that "[w]hen the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations." In *State v. Crotsley*, 308 Or 272, 779 P2d 600 (1989), the Supreme

---

[1] ORS 166.220(1) provides:

"A person commits the crime of unlawful use of a weapon if the person:

"(a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined in ORS 161.015; or

"(b) Intentionally discharges a firearm, blowgun, bow and arrow, crossbow or explosive device within the city limits of any city or within residential areas within urban growth boundaries at or in the direction of any person, building, structure or vehicle within the range of the weapon without having legal authority for such discharge."

[2] The court acquitted defendant of the remaining count, attempted murder.

Court described the history and purpose of ORS 161.067 (in the context of its nearly identical precursor, ORS 161.062(1) (1987), *repealed by* Or Laws 1999, ch 186, § 1). The court noted that the statute was adopted by the people in 1986 as part of the "Crime Victims' Bill of Rights" initiative and that it rejected earlier decisions of this court requiring consolidation of multiple convictions and sentences arising from the same criminal episode. The court concluded that the provision reflects a legislative intent that "a person who commits multiple crimes by the same conduct or during the same criminal episode should have a criminal record reflecting each crime committed * * *." *Crotsley*, 308 Or at 277.

In *Crotsley*, the court applied *former* ORS 161.062(1) to the defendant's convictions for first- and third-degree rape involving a 14-year-old victim. 308 Or at 275. The court observed that the statute contains three requirements: (1) it applies only to acts that are the same conduct or part of the same criminal episode; (2) the acts must violate two or more statutory provisions; and (3) each statutory provision must contain an element that the others do not. *Id.* at 278. The court concluded that, in committing the charged crimes, the defendant had engaged in a single criminal episode, that his acts violated two or more "statutory provisions," that is, provisions addressing "separate and distinct legislative concerns," and that each provision at issue in that case required proof of an element that the others did not. *Id.* Specifically, the court determined that ORS 163.375, setting out the crime of first-degree rape, provided "three alternative combinations of elements" that constituted that crime—the use of forcible compulsion, ORS 163.375(1)(a); a victim under 12 years of age, ORS 163.375(1)(b); and a victim who is a close family member of the perpetrator and is under 16 years of age, ORS 163.375(1)(c). *Crotsley*, 308 Or at 278-79. Where the defendant was charged with first-degree rape based on his forcible compulsion of the victim and his conviction for third-degree rape was based on the victim's age, those convictions addressed separate legislative concerns and required proof of different elements; accordingly, the convictions did not merge. *Id.* at 279-80. The court reached the same result with regard to the defendant's convictions for first- and third-degree sodomy. *Id.* at 280.

On the same day that the court decided *Crotsley*, it decided *State v. Kizer*, 308 Or 238, 779 P2d 604 (1989). In *Kizer*, the defendant argued that the trial court had erred in convicting and sentencing her on two counts of forgery when she had forged and passed a single check. The court held that, although the forgery statute, ORS 165.007, superficially appeared to contain two separate criminal prohibitions (against "making" or "uttering" a forged instrument), the accompanying legislative commentary clearly revealed a legislative intent to define a single crime. As such, the court concluded, the defendant could not be convicted of two separate counts of forgery—one for "making" a bad check and the other for "uttering" that same check. *Id.* at 243-44. *Kizer* thus demonstrates that it is necessary to examine the relevant substantive statute (or statutes) in order to determine whether the legislature intended that particular conduct be treated as violating "two or more statutory provisions" for purposes of ORS 161.067(1). The court stated that the phrase "statutory provision[ ]" as used in *former* ORS 161.062(1) does not necessarily depend on a technical appraisal of how many sections, subsections, or paragraphs a statute includes. *Id.* at 243.

Next, in *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), the Supreme Court considered a defendant's claim that, even if the state had properly charged him with three counts of aggravated murder under ORS 163.095, each on a different theory of aggravation, he could be convicted of only a single count of that crime when there had been a single murder victim. The court began by observing that ORS 163.095 sets out a number of circumstances that convert intentional murder into aggravated murder. After examining that statute, the court concluded that the legislature did not intend to treat each of the enumerated aggravating circumstances as a separately punishable crime but, instead, intended to set out the various theories that could be used to prove one element (aggravation) of a single crime, aggravated murder. Thus, the court held, the fact "[t]hat defendant's conduct in intentionally murdering the victim * * * was 'aggravated' by 'any,' *i.e.*, one or more, act surrounding that conduct does not convert that conduct into more than one separately punishable offense." *Barrett*, 331 Or at 36.

That is, the court concluded that the defendant could be convicted of only a single count of aggravated murder.[3]

Most recently, the court decided *State v. White*, 341 Or 624, 147 P3d 313 (2006). In *White*, the defendant was convicted of two counts of burglary based on his entry into a building with the intent to commit the crime of assault and his entry with the intent to commit the crime of menacing. *Id.* at 627. The court stated, consistently with *Barrett* and *Crotsley*, that in order to determine whether the defendant's conduct violated "two or more statutory provisions," the proper analysis is to first determine whether the prohibitions violated by the defendant involve "separate and distinct legislative concerns." *White*, 341 Or at 638. The court then explained that the text of the burglary statute reveals a legislative intent to treat a single unlawful entry as a violation of only one statutory provision, even where the defendant enters with the intent to commit more than one crime. *Id.* at 640. "The burglary statute refers to an 'intent to commit *a* crime' * * *—any crime." *Id.* (emphasis in original). "Under the clear words of the statute, the state must prove some criminal intent, but the nature of the intended crime is irrelevant." *Id.* (emphasis omitted). The court concluded that there is no basis to differentiate a burglary based on an intent to assault and a burglary based on an intent to menace. *Id.* The convictions therefore merged. *Id.* at 640-41.

This court also has decided several cases that inform our analysis. In *State v. O'Neall*, 115 Or App 62, 836 P2d 758, *rev den*, 314 Or 574 (1992), we considered whether the subsections of the first-degree kidnapping statute constituted separate statutory provisions for purposes of ORS 161.067(1). The kidnapping statute provides that that crime can be proved by establishing that the defendant either took a person from one place to another or secretly confined a person in a place where that person was not likely to be found. ORS 163.225(1)(a) and (b). We held that those two

---

[3] The court acknowledged, however, that the fact of unanimous guilty verdicts on multiple theories of aggravation should in some fashion be memorialized. *Barrett*, 331 Or at 36-37. Accordingly, the court remanded the case to the circuit court for resentencing, with instructions to enter a single judgment of conviction for aggravated murder, which judgment would enumerate each of the aggravating circumstances that the jury had found to exist. *Id.* at 37.

alternatives addressed separate legislative concerns because "[t]aking a person from one place to another involves dangers and risks different from secretly confining a person in a place where the person is not likely to be found." *O'Neall*, 115 Or App at 68.

In *State v. Nevarez*, 168 Or App 325, 329, 5 P3d 1200 (2000), the defendant was convicted of two counts of first-degree robbery. One count alleged a violation of ORS 164.415(1)(b), robbery while using "a dangerous weapon." The other count charged the defendant with violating ORS 164.415(1)(c) by "attempt[ing] to cause serious physical injury" in the course of the robbery. The defendant argued that those convictions should merge because she robbed only one victim and because the charges required proof of the same elements. The state responded that *former* ORS 161.062(1) precluded merger because "each of the prohibitions that defendant violated is designed to deter a different harm, intent, or evil." We agreed with the state:

> "In that regard, this case is similar to *O'Neall*. * * *
>
> "The subsections at issue in this case similarly address different harms and risks. ORS 164.415(1)(c) is concerned only with serious physical injuries. Subsection (b) is not so limited. By proscribing the use of a dangerous weapon, subsection (b) not only recognizes concerns about elevated risks of physical injury, but also is concerned with the psychological effects—*e.g.*, heightened terror to the victim—as well as the increased likelihood that the robber will successfully overcome any resistance to the robbery. The latter risks are elevated even if the perpetrator does not intend to cause or does not actually cause serious physical injuries. Said another way, one subsection addresses legislative concerns about increased risks of physical, emotional, and proprietary harm with the use of dangerous weapons, while the other addresses concerns relating only to serious physical harm. Although those concerns overlap in some respects, they are not identical. We therefore conclude that ORS 164.415(1)(b) and (c) define two separate crimes."

*Nevarez*, 168 Or App at 329-30.

In *State v. Johnson*, 174 Or App 27, 25 P3d 353 (2001), *rev den*, 334 Or 492 (2002), we upheld separate convictions for robbery in the first degree under ORS

164.415(1)(a) and (b), concluding that the two subsections are separate statutory provisions for purposes of merger of convictions. *Johnson*, 174 Or App at 31-32. We noted that the legislative concerns expressed by ORS 164.415(1)(b) are " 'elevated risks of physical injury [and] the psychological effects—*e.g.*, heightened terror to the victim—as well as the increased likelihood that the robber will successfully overcome any resistance to the robbery.' " *Id.* at 31 (quoting *Nevarez*, 168 Or App at 329-30).

We analyzed the problem in this way:

"Subsection (b) requires the use or attempted use of a dangerous weapon. A 'dangerous weapon' is an object 'which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury.' ORS 161.015(1). In contrast, subsection (a) requires that the offender be armed with a deadly weapon. A 'deadly weapon' is 'any instrument, article or substance specifically designed for and presently capable of causing death or serious physical injury.' ORS 161.015(2). Subsection (a) focuses on the psychological and coercive effect on victims being confronted by an armed offender, while subsection (b) focuses as well on the physical risks attendant to the use or attempted use of a dangerous weapon. Thus, ORS 164.415(1)(a) and (b) are separate 'statutory provisions' for purposes of merger of convictions, because they address different risks or harm."

*Johnson*, 174 Or App at 31-32.

Finally, in *State v. Luers*, 211 Or App 34, 153 P3d 688, *adh'd to as modified on recons*, 213 Or App 389, 160 P3d 1013 (2007), the question was whether the defendant's multiple first-degree arson convictions and his multiple attempted first-degree arson convictions were subject, respectively, to merger under ORS 161.067(1). We began by examining the relevant offense statute. ORS 164.325 (1999)[4] provided:

"(1)   A person commits the crime of arson in the first degree if, by starting a fire or causing an explosion, the person intentionally damages:

---

[4] Defendant committed the charged offenses in 2004 when the 1999 version of ORS 164.325 was in effect.

"(a) Protected property of another;

"(b) Any property, whether the property of the person or the property of another person, and such act recklessly places another person in danger of physical injury or protected property of another in danger of damage; or

"(c) Any property, whether the property of the person or the property of another person, and recklessly causes serious physical injury to a firefighter or peace officer acting in the line of duty relating to the fire.

"(2) Arson in the first degree is a Class A felony."[5]

Each of the defendant's arson offenses, as pleaded and proved, as well as each of his attempted arson offenses, violated only one statutory provision, ORS 164.325(1)(b). That aspect of our analysis weighed in favor of merger under ORS 161.067(1). *Cf. Barrett*, 331 Or at 35 (use of a single section is some indication that legislature intended to define a single crime). We further concluded that the circumstance at issue in each offense did not require proof of an "element" that the other circumstances did not. *Luers*, 211 Or App at 62.

We then turned to whether ORS 164.325(1)(b) reflected a single legislative concern, on the one hand, or "separate and distinct" legislative concerns, on the other. We stated:

"By its terms, ORS 164.325(1)(b) involves intentional damage to property, with either of two consequences: recklessly placing another person in danger of physical injury or recklessly placing protected property of another in danger of damage. On their face, those two separately stated consequences might appear to implicate separate and distinct legislative concerns. Given the definition in ORS 164.305 of 'protected property,' however—property 'customarily occupied by people'—we understand those two consequences to reflect a single concern, namely, to protect human life and safety. *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 144 (July 1970) ('The aim of the Commission is to

---

[5] We also referred to ORS 164.305 (defining protected property as "any structure, place or thing customarily occupied by people, including 'public buildings' as defined by ORS 479.168 and 'forestland,' as defined by ORS 477.001").

protect human life and safety by enhancing the degree of arson to first degree when the property involved is a building, structure or thing of a kind which is typically occupied by people.'); *see also id.* at § 141 (definition in ORS 164.305 of '[p]rotected property' has the purpose of protecting structures or things typically occupied by people and is consistent with the 'primary rationale' of the arson offense, which is the protection of human life or safety; the definition includes 'forestland' because forest fires also present a high risk to human safety).

"Certainly, those alternative consequences are not separate legislative concerns in the manner of the convictions in *Crotsley*—concerns about rape involving, respectively, forcible compulsion, a victim under 12 years of age, or a victim who is a close family member under 16 years of age. Rather, the distinctions embodied in ORS 164.325(1)(b), to the extent that there are any, are more akin to those in *Barrett*: various circumstances involving a danger to the life and safety of persons, each of which serves the purpose of aggravating the crime to first-degree arson. *See* 331 Or at 36 (the harm that the legislature intended to address in ORS 163.095 was 'the intentional, aggravated killing of another human being'). Put differently, the stated circumstances 'constitute no more than different theories under which [second-degree arson] becomes subject to the enhanced penalties' for first-degree arson. *See* 331 Or at 36 (applying that standard to multiple convictions for aggravated murder)."

*Luers*, 211 Or App at 63.

We conclude from the preceding discussion that to ascertain legislative intent, we first must choose the appropriate level of abstraction to guide the analysis. In *Luers*, for example, we could have viewed legislative concerns about damage to property that is occupied and injury to persons either as separate or unitary. We adopted a generalized level of abstraction, concluding that the legislative concern expressed in ORS 164.325(1)(b), a single subsection with only one set of elements, was unitary. That selection was correct, because the exclusive legislative concern evinced in the statute was for intentional damage to property that poses a threat to human life and safety. The means of triggering that concern—whether by recklessly endangering a person or

recklessly endangering property that people customarily occupy—are not, themselves, separate concerns. Again, indeed, they are not even separate and distinct elements. *Luers*, 211 Or App at 62.

Similar reasoning explains the results in *Kizer* (legislative commentary expressly showed that forgery committed by falsely making, completing, or altering a written instrument "or" uttering a forged instrument is a single crime that can be proved in alternative ways), *Barrett* ("aggravation" of murder is a single element that can be proved under alternative theories), and *White* (burglary element of "intent to commit a crime" can be proved in numerous alternative ways, but captures only a single legislative concern). In each of those cases, the legislative focus was on a broad, unitary risk or harm that could be triggered by any of several legally interchangeable means, the proof of any one of which would satisfy the same element of the offense.

In cases like *Crotsley*, *O'Neall*, *Johnson*, and *Nevarez*, on the other hand, a more specific level of abstraction was appropriate. In those cases, the courts concluded that separate statutory subsections involving different elements demonstrated separate legislative concerns, because those subsections addressed distinct and particularized risks or harms.

With the foregoing conceptual distinctions in mind, we turn to the circumstances of this case. It is undisputed that defendant's conduct arose from a single criminal episode and that ORS 166.220(1)(a) and (b) contain different elements. ORS 166.220(1)(a) provides that a person commits the crime of unlawful use of a weapon if he or she attempts to use the weapon against another or carries or possesses the weapon with the intent to use it unlawfully against another. In contrast, subsection (1)(b) applies when the person actually discharges the firearm, and does so either at an individual, a building, a structure, or a vehicle. The question whether subsections (1)(a) and (1)(b) constitute two statutory provisions, that is, whether they address separate and distinct legislative concerns, is a close one. However, we conclude that they do.

By its terms, subsection (1)(a) is directed toward the risk posed by individuals carrying weapons with the intent to

unlawfully use them against a person, whereas subsection (1)(b) is concerned with the actual discharge of a weapon in a manner that creates a risk to people, buildings, or vehicles in urban areas. To be sure, as in *Luers*, the text suggests that the ultimate legislative concern of both subsections is preventing harm to persons; however unlike in *Luers*, the structure and legislative history of the statute demonstrates that a more particularized focus is appropriate. First, unlike the statute in *Luers*, ORS 166.220(1) is divided into multiple subsections with different elements. But more importantly, the history of that statute demonstrates a legislative intent to distinguish between the risk of harm to an intended victim of a person who carries a weapon, subsection (1)(a), and the risk of harm to bystanders in drive-by shooting incidents, subsection (1)(b).

In its early iterations, the statute prohibited only the acts that are now described in subsection (1)(a). *See, e.g.*, Or Laws 1975, ch 700, § 1. Then, in 1991, the legislature enacted subsection (1)(b). In doing so, the legislature intended to enact a law to protect against drive-by shootings that put bystanders at risk. Minutes, Senate Committee on Judiciary, SB 638, Mar 13, 1991; Minutes, House Committee on Judiciary, Apr 24, 1991, Ex I. One person who testified in support of the bill observed that current law (what is now subsection (1)(a)), provided police with little recourse in such shootings, because people who commit drive-by shootings "may intend to target a house or a vehicle." Minutes, Senate Committee on Judiciary, Mar 13, 1991. In other words, in drive-by shootings, the shooter need not have a specific human target or victim in mind and may simply intend to discharge a firearm. But, in doing so in an urban area, the shooter creates a risk that the bullets may strike cars, houses, businesses, and their occupants.

In short, ORS 166.620(1)(b) was enacted to address risks not adequately covered by the existing law. Those additional risks were implicated in this case; not only did defendant possess a gun with the intent to use it against a particular victim, but he also shot at a vehicle and a house. Although the two statutory provisions fall broadly within the same statute, they are set out in different subsections, involve different elements, and address separate and distinct legislative concerns. Accordingly, the trial court did not err in

declining to merge defendant's convictions for unlawful use of a firearm under ORS 166.620(1)(a) and (b).

Affirmed.